v. USA et al. Oral argument not to exceed 20 minutes per side. Mr. Hawley for the appellant. May it please the court, I'm Michael Hawley and I represent Mr. Cruz Martinez in this appeal. I would like to reserve five minutes, your honor, please. Thank you. Now this case, of course, requires the court to interpret the extradition treaty between the United States and Mexico, in particular, Article 7, which is titled Lapse of Time. The gist of Article 7 is really quite simple. Mexico has agreed that with respect to lapse of time laws, it will comply not just with its own laws, but with the laws of the United States. As a result, if the United States couldn't prosecute due to a lapse of time, then Mexico can't extradite. It is really that simple and straightforward, and that interpretation is supported by the plain language of the statute, historical background, and also by rules of construction. Now, as for the plain language, the drafters chose to write this phrase in a way that defined a class of laws, instead of just identifying a specific type of law. And that general language shows a general purpose to include anything that falls in that type of language, you know, in the present or in the future. And so the drafters created that class, and the plain language used, lapse of time, is used commonly. It's used in a You know, both myself and the panel decision cited a lot of cases that use the phrase lapse of time to refer not just to statute limitations, but to other types of defenses, including the Speedy Trial Clause. So the plain language easily encompasses the Speedy Trial Clause. Now, can you have a speedy trial violation based on lapse of time alone? Your Honor, it has to be coupled with official negligence under Doggett. Now, under Doggett, though, they held that there was a violation after, due to more than six years passing, based only on official negligence. You also have to have prejudice. Your Honor, at that point under Doggett, the prejudice is presumed enough to grant relief. The prejudice is one of the inquiries. Yes, Your Honor. It's one of the inquiries, but I believe Doggett's holding granting relief based on the idea that so much time has passed, and it's unfair to require the defendant at that point to have to prove the actual prejudice, to have to prove memories failed and so forth, that it was going to be enough  So, and you know, I mean, speaking in decisions, the Supreme Court, other courts have indicated that, you know, that this is a matter of a lapse of time, that there may be other inquiries involved. Now, under a statute of limitations, there are frequently other inquiries involved, such as, is there tolling, was the person a fugitive, and things like that. Is the term lapse of time used consistently throughout these treaties? In some treaties, there's the phrase lapse of time, and there's also a statute of limitations. What should we make of it if you have no reference to statute of limitations and only lapse of time and vice versa? Yes, Your Honor. Most treaties refer to one or the other. I believe there's one reference that at some point specifies when a statute of limitations applies, but they usually refer to one or the other. And, you know, as the Supreme Court said in Valentine, we must assume that the representatives of the government are aware of these two options. You know, then we're talking about this case, of course. The representatives of the government, when negotiating extradition treaty, are aware of their options, that other treaties have different language. And other treaties do have this different language, barred by limitations. Or as recently as 1998, South Korea's was barred by the statute of limitations. So there are other more narrow options out there for the drafters. And when they choose this broader language, it shows the general purpose to include whatever falls in the class. Now, you made the comment, you argue that the, what's the, Malonis, is that the pronunciation of the case from 1960 from the Alabama district judge? Yes, Your Honor. Do you have any evidence that the State Department was aware of Malonis when it was negotiating this treaty in 1978? Your Honor, I believe the case, In re Macking, that I cited, refers to the U.S. State Department internal documents discussing Malonis. Of course, they were involved in that case and lost that case and declined to seek extradition against Malonis through another court. So, you know, at least in 1960 they were aware of it. You know, rereading over Valentine, the Supreme Court decision from 1936, I find a very interesting parallel in that case. In that case, they held the State Department negotiators to knowledge of a district court decision that had interpreted the clause they used 30 some years earlier. In that case, the Mexican treaty from 1861 had a clause about extraditing citizens. In 1891, a district court, apparently the only one to rule on it as far as the decision lets on, had ruled that the United States did not have the power to extradite its citizens based on that clause. And then about 20 years later, 18, 20 years later, the United States negotiated a treaty with France, used the same clause from the Mexican treaty that the district court had interpreted. And they relied partly on that. They relied partly on the fact, well, you know, look, the courts have said that this is what this clause means. And, you know, we must assume that the negotiators had that kind of knowledge. What do you make of the fact that the Senate Judiciary Reports, Committee Reports, make no comment about this being a significant change from the 1899 treaty with Mexico? Yes, Your Honor. You know, let me inform you that the Committee Reports are just that, they're Committee Reports instead of the statutory language. But, you know, the Committee did not have before them the particular question that the court Milonas had. They were not asked to opine on this issue. And, you know, they were not giving an opinion on that issue. And, you know, so maybe the person writing it thought of the first identifies the obvious example, which would be a statute of limitations and remarks on that. And as for not noting the change, you know, since 1908, as the government points out, these lapse of time phrases were becoming quite common. And, you know, there may have been no reason to signal it out as, well, here's a very special thing that we negotiated in this case. If Milonas were not on the books, would that be the end of your argument? I mean, would that be just fatal to your position? Your Honor, I think Milonas helps a lot. But, you know, really there were two changes between the 1899 treaty with Mexico and the 1978 treaty. One, as the government partly points out, is the development of the Speedy Trial Clause as a law with teeth. And, you know, the sense that giving American negotiators the perception that they come from a country with a mixed bag of laws that might apply. So, you know, that would explain why they reached out and used broader language. And in particular, in 1972, Barker v. Wingo was decided, which was a major Speedy Trial Clause case. Yes, Your Honor. And even, you know, the government acknowledges that definitely by that time, the Speedy Trial Clause was well, you know, well in the headlights. What do you make of the fact that the government's argument is, well, that the limitations and lapse of time were interchangeable synonyms back in the early 1900s? Your Honor, I believe they were commonly associated, but I think it goes too far to say they were synonyms. They, you know, for some reason, which the government has not been able to explain, the drafters chose this broader language. And although, you know, speaking casually, one might say that, sure, this lapse of time article refers to things like the statute of limitations. No one had given an opinion on that very question except for the court Milonis. Limitations seems like the narrow, I mean, which one's narrow and which one's broader? I mean, you concede you lose if it just says limitations, right? Your Honor, yes, yes. But clearly implied in limitations was the word time. It wasn't applying to all limitations on government prosecutions, right? Your Honor, I believe that barred, the phrase barred by limitations is pretty clearly a, essentially a term of art. It's barred by statute of limitations.  See, I would have said implied was barred by time limitations. Your Honor, I think in the terminology used by the courts and so forth, limitations were very commonly referred to statute of limitations. And by shifting over to language of lapse of time, they brought in a descriptive clause. Lapse of time would include things beyond the statute of limitations, would it not, in that it would include things like latches and property rights and even speeded trial rights, things that are beyond simply statute of limitations. So in that sense, the lapse of time phrase would be broader. Yes, Your Honor, and, you know, throughout the 20th century, I mean, there were lots of uses of the phrase lapse of time to include various defenses. You know, and the restatement of foreign relations law uses it at one point in connection with other defenses other than statute of limitations. Counsel, is this one of these treaties where both the Spanish and the English are authoritative versions or is the English the authoritative version? I believe the treaty itself says that both languages are equally authoritative. What's the Spanish? Your Honor, the Spanish is, I don't have it right here in front of me, but the government has not tried to say. It's a speedy trial act. I know that neither you nor the government make some of the arguments that you would expect in an international tribunal. I mean, they'd be looking at both languages and they'd be looking at the international discourse. You know, I've heard too much of that from either one of you. That's why I'm asking. If both of you say, well, the other one's not arguing it, then I guess we'll never get that. I believe that what's been accepted in this case is that Article 7 is properly translated in English. If it was, you know, we don't know if it was negotiated in English or Spanish and which is the translation, but I think it's accepted that there is no meaningful difference. Let me ask this then. If the words mean the same to the Mexicans as they mean to us, which presumably they do, shouldn't we just as much be looking at what's going on over in Mexico and what they might have had in mind when they put that in the language? I mean, we don't dictate language to other countries. We negotiate it, right? No, we don't, Your Honor. And Mexico has accepted that language. Right. What did they think they meant when they were accepting it? You're talking about what the American negotiators thought they meant when they accepted it. Yeah. Nothing. There really hasn't been any evidence of what anyone was thinking when negotiating this treaty. And, you know, Mexico could have— It's not relevant, though, is it? Sure. And, you know, the government here has not identified any negotiation documents, the types of documents that one would defer to in terms of deferring to the executive opinion. What about how the document has been applied or that language has been applied? Your Honor, you know, there have not been many cases that came up under it. Do you know if there is any speedy trial or limitations in Mexico? I don't know of anything other than the statute of limitations, which does cover pre-accusation, post-accusation delay, and so forth. You know, Mexico has not filed a letter or filed an amicus brief or anything saying that they are bothered by the interpretation that the panel made. Mexico is free to do that. They've done so in at least the— Did they do anything after the district court decision, which went the other way? No, Your Honor, but, of course, they wouldn't have such an impetus at that point if they— I'm just curious, by the way, where is your client now? Is he in jail waiting? He is, Your Honor. He's been detained since the provisional arrest in, I believe it was June 2013. I'm trying to understand the comparators that both parties have spoken about in this and looking at the other treaties that use this language. Help me understand two things. One, why if barred by lapse of time versus barred by limitation is different, why that wasn't reported in the document that specifies the differences from the old one? You addressed a little of that. And then I'm struggling with the other treaties that are out there, such as Turkey, which evidently was submitted on the same day, uses lapse of time, but it notes in transmitting it that the lapse of time provision referred to offense is barred by a statute of limitations. And the same sort of analysis is found in New Zealand, Thailand, and Italy from the 70s and the 80s. Explain to me how that matters or doesn't matter. Well, Your Honor, as Justice Scalia said in the case I cited, we are a government of laws, not of committee reports. These committee reports are not what's boiled down and become the law. Just because whoever is writing a particular committee report wasn't thinking of all the possibilities doesn't mean that the law doesn't say what it says. And, in fact, in our committee report for the Mexican treaty, it doesn't say statute of limitations. It says lapse of time. I don't think the committee report can carry such weight that it overcomes the language of the statute. We're asking to assume that drafters knew about some things, such as the marginalia in a treaty from 1877 or something that says statute of limitations and lapse of time, which the government has noted. But I think it's more likely that they know about Milonis, a district court case where the judiciary has said what that clause means, and the drafters should be expected to understand that. Isn't it true that even Justice Scalia, who is kind of the leader of not looking at legislative history, approves of looking at the negotiating history of treaties to interpret treaties? Yes, Your Honor. And, you know, the negotiating history does not include... Well, you use negotiating history to figure out what they had in mind. Yes, Your Honor. Well, there's no document, there's no report showing anyone's opinion on this issue. And I believe the restatement of foreign relations law, I think it's section 926, says, you know, you defer to the executive opinion generally, but it gets the least deference when the opinion on this particular issue comes up in a case and it involves individual rights, it says here. Now, I know you're out of time, but this, again, this Milonis case was the only published case on this issue of lapse of time at the time of the negotiation of the 1978 treaty. Is that right? That's right, Your Honor. All right. Well, before you end, may I ask one practical question? Yes. How does this play out? How does it work? Well, Your Honor, the panel ordered a remand. No, not here. Assuming the Speedy Trial Act does apply, how does it work in the relations between Mexico and America and extradition from either to the other? What are the practical consequences? Well, it just means that Mexico can't do, you know, the kind of thing they did here, which is quite arbitrary, which is, you know, help enter an agreement to close the matter, off to the side, get an arrest warrant, and then let years and years pass without lifting a finger to try to let the person know or even to submit just the three-page request that they had to submit to get extradition. So, you know, it puts Mexico on notice that post-accusation delay is significant too. And, you know, Mexico can try to figure out all the nuances of law. They may be doing that now. They may not be because here they waited more than five years, which they could have assumed was the statute of limitations. And what would the responsibility of American courts be if we wanted to extradite, if there was a request to extradite someone from Mexico? From Mexico? Your Honor, the defense would be raised, if I get your question right, the defense would be raised in the Mexican courts, and they would review that kind of thing, which I cited a couple of examples from England where, you know, they have reviewed whether American prosecutors acted promptly enough to satisfy the speedy trial clause. That would mean the Mexican authorities have to apply the cases like Doggett and so forth? Yes. How fast? Yes, Your Honor. How fast our procedures, how fast our authorities have moved and so forth? Yes, Your Honor, and this is somewhat of an odd thing, what Article 7 does, which is putting the Mexican prosecutor in the American's shoes and vice versa. But that's what they've done. That's not so much of a problem if you just have a clear or fairly clear time limit. Once you have a scheme where instead each party in an international agreement has agreed to apply an amorphous standard that courts in one state are familiar with but the courts in the other presumably aren't, you have kind of an odd conceivable but unlikely kind of scheme. Wouldn't you say that's true? Your Honor, if I may, the idea of this was simple, was put each other in each other's shoes. I understand, but when the other's shoes are elastic, it's more difficult than if you're just talking about a foot ruler. Well, sure, Your Honor, except that the statute of limitations already brings up thorny questions, which we had in this very case. The court had to decide which one applied. It had to decide what act by the Mexican actor could count as an indictment. And then if it had ruled in our favor on that issue, it would have to decide was Mr. Cruz-Martinez a fugitive. Do you get one crack at it or two? If the Mexican court decides that the speedy trial rights weren't violated, you get extradited back, is that your chance? Is it laterally stopped or do you get to argue to the U.S. court now that you're here that your speedy trial rights were violated? And, Judge White, I think you're talking about Judge Stranch's hypothetical where the United States is extraditing someone back to our country. I believe that person would have a crack at it in Mexico and then in the United States. Both? Yes, yes. Okay, your initial time period is expired. Okay, thank you. Mr. Hawley, thank you. Good afternoon. May it please the Court, Dave Lieberman for the United States. If I could start out with the line of questions that Judge Rogers and Judge Stranch posed at the end of my colleague's presentation, what will happen? The United States currently has 80 extradition treaties on the books that use some variant of the lapse in time phrasing. And so in Mr. Cruz's view, fugitives who are sought under those treaties will all raise claims under Barker v. Wingo. And extradition judges around this country will have to decide not just the time issue, but whether the foreign prosecutors and judges in those countries acted with due diligence or acted in bad faith or negligently. And our extradition judges around this country with respect to those 80 countries will have to decide whether the time delay is likely to prejudice the defendant or the fugitive back in Mexico or back in one of those foreign proceedings. That would be a major expansion of extradition hearings in this country. These are typically limited affairs. That does portend significant consequences on our relationships with our foreign treaty partners. And it runs headlong into several admonitions from the U.S. Supreme Court in this context. Well, wait a minute. All those individuals wouldn't be subject to Barker v. Wingo analysis, only the ones where there had been a protracted or elongated time frame that would be in question. So of the universe of individuals you mentioned, only a fraction of those would be serious contenders for a Barker v. Wingo analysis. I disagree, Your Honor. Under Barker v. Wingo, there's a threshold step. Is there a year of delay between and in every extradition case that we can find.  What do you mean a year of delay? A year of delay between the filing of charges and then formally seeking extradition from our country. If we're putting the Barker factors onto the extradition context. Well, that's not what this case says. That's not what this case is about. There's nothing in here about a year of delay being the trigger or the threshold. That's an entirely different factual scenario that you're conjuring up. My understanding under Barker, and the court can correct me if I'm wrong, is that if there's been a year of delay between the filing of charges, or in this case the filing of the arrest warrant, and then whatever operative act in our country that would be the start of the trial, in this case it appears under Mr. Cruz's view it's the filing of the extradition request. Under Barker, if the delay exceeds one year, you then go to all three Barker factors, time, prejudice to the defense, and negligence to the government. In this case, that would be Mexico. So we think every fugitive will be able to get to those prongs that I was just talking about. That's not this case. We would resort in this case to Barker v. Wingo under similar factual circumstances. Barker v. Wingo is invoked in this case only for the balancing factors to determine what the equities are, not for the one-year prohibition on time frame. That's not why there's no reference in our case to utilizing it for that. In our case, the case would be remanded for Barker v. Wingo balancing, and then if there was reasonable diligence by the Mexican government for the delay, that would be the end of it. There wouldn't be any benefit to be derived by Mr. Martinez even if there was a speeded trial violation. So our case, in that sense, is very narrowly constructed, not this parade of horribles that you're coming up with in the way you elongate or expand the application of Barker v. Wingo in your argument. Your Honor, under your articulation, Mr. Cruz would go back and the district court would decide whether or not the Mexican government acted diligently or negligently or in bad faith. That's a proper consideration of the Barker factors, and that is exactly something that courts, including the U.S. Supreme Court, have cautioned going back to 1901 in the Grimm case. Avoid construction of extradition treaties that would subject foreign governments to the rules and procedures of U.S. criminal laws. What you're talking about is not our case. This ruling here was narrow. You're expanding this to the whole universe of cases where there's an alleged delay, which is not this case. I interpret Mr. Cruz's claim, which goes to the description of the lapse in time language in this treaty, would apply to every treaty on the books that has the same phrase, and he hasn't disputed that. And the government's concern here is that every one of these fugitives under any one of these treaties is going to be in the same shoes as Mr. Cruz. We have concerns on that for the comedy principles and for our extradition system, but we also don't think that that aligns well with the plain language of the treaty, which is always the starting point. We read the plain language of barred by lapse in time as referring to a time period in which the prosecution must commence. If that period lapses, the prosecution cannot occur. That's a classic definition of a limitations period. But it's also reciprocal, so American citizens who are experiencing a lapse of time, might be incarcerated somewhere, they would get the same benefit if the roles were reversed that the Mexican citizen would get here. So under this reciprocal treaty with both countries having the same, citizens having the same rights, there are benefits to be derived here. Otherwise, an American citizen could wind up with no subpoenaed trial rights in similar circumstances. In other words, the American citizen's Sixth Amendment rights could go down the drain if we accepted your argument. An American citizen has no Sixth Amendment rights in Mexico. That's the Neely case in 1901 from the Supreme Court. When a citizen commits a crime in Mexico, the Supreme Court has said for over a century he submits himself to the rules and procedures and safeguards in that country. Now, Mr. Cruz has an additional protection under the treaty in this case, the U.S. statute of limitations. He also can apply to the Secretary to stop the extradition in his case. But in the government's view, those are the protections. Now, the plain language that I was referencing earlier, that doesn't marry up well to the speedy trial clause, because the speedy trial clause in the Supreme Court said this in Barker, there's no fixed point. It's not about time periods. It's about a balancing test with equitable considerations. So if there is no time period under the Sixth Amendment speedy trial clause, there can be no time period that lapses. A speedy trial clause by definition is a speedy is time, is it not? You're not talking about racetracks. The best plain language interpretation that we see is referring to countable days. And we think that that is also borne out by the context, the greater context. It's sort of trite, but courts often say we don't construe statutes and treaty. We don't construe isolated words in statutes and treaties. We construe everything as a whole. In the extradition hearing, 200 years, historically been limited to a probable cause determination, and the magistrate judge decides as a legal matter whether or not the fugitive has satisfied the requirements of the treaty. Well, tell me, why in 1978 did the treaty negotiators not just leave things as they were from 1899, lapse by limitation? They changed it. They did change it, and we have charted this back to 1877, which is when this country started changing from limitations to lapse of time and picked up speed in 1908. We've pulled every historical document that we can find going back to 1850, and unfortunately there's no clear signal as to why the change. But we do our best judgment as to why the change from limitation to lapse of time is to accommodate our foreign treaty partners. In the United States, we use the term statutes of limitations. That is a phrase common in the common law. Most of our treaty partners are civil law systems, such as Mexico, and they don't use the statute of limitation term. They use the term prescription. And so in our best judgment, our diplomats wanted to move off the U.S.-centric language, which is limitation, and apply a phrase that was more neutral, that referred to the bodies of law from both countries. And they're not clear dead-bang markers, but the best evidence that we see of this is in the John Moore 1891 Treatise and in the State Department Digest that we cited from 1968. Both Mr. Moore and the State Department identified the lapse of time phrase and then said it commonly refers to statutes of limitations and prescription. And this goes right back to a question that Judge Rogers asked. What's the term used in Article VII of the Mexico Treaty? The term is prescrito, prescription. And so... That sort of wins your case and you never cite it? Wisdom sometimes comes late, Your Honor. This was a discussion that we had upon reviewing the reply brief in this case to try and figure out what the change was. We saw no concrete evidences. This is just the best inference that we have come up with as the government. So did the Spanish language change? The Spanish language from the 1899 treaty to the 19... It did. I don't have that in front of me. I don't know what... I don't believe they used the exact phrasing prescrito. The language we're looking at now is prescrito? Yes, and it's in the documents. The prescrito, the Spanish language version is in the treaty. I think it's in the record. The official version of the treaty has both an English language and a Spanish language document. And the inference that we take that our diplomats were trying to encompass both limitation and prescription, that language, is consistent with the history that we cited to in our supplemental... Prescription means statute of limitations? Yes. In civil law countries, it has the same meaning. Why wouldn't we keep that language that was already in there in English then? I'm sorry? Why wouldn't they have just kept barred by limitation then? Because that's the closest definition to prescrito, apparently. But they didn't. They went to a broader term. Again, the best inference that we have is that we wanted to select treaty terms that would properly reference both. The State Department was aware of this Malonis case, was it not, from 1960? Yes, it was. And they knew, therefore, the only opinion out there in the whole world of the federal judiciary was that this included, lapse of time, included the Speedy Trial Act cause. A couple of points, Your Honor. They knew it, but there was no way for the government to get Malonis off the books. We could not appeal that decision. Appeals by a... The government may not take appeals from 3184 proceedings, and that was a 3184 proceeding, or maybe the predecessor statute. Mr. Hawley says we could have refiled the request in the Northern District of Alabama, but I presume we would have been met with the same fate, or we would have had to try to get the judge to... But knowing that you couldn't do anything, you'd think at the very least the Senate Judiciary Report, somebody would have, or some senator would have said, now, you know, this broadening the lapse of time doesn't include that crazy Alabama case. I would point, Your Honor, to the State Department Digest, 1968, sets forth the official views of the State Department with respect to questions of international law. The Digest summarized the Malonis litigation, mentioned Mr. Malonis's speedy trial claim, and then reprinted the official guidance from Malcolm Wilkie, the head of the criminal division of the Justice Department, the official responsible for all of our extraditions at that time. And Mr. Wilkie said speedy trial protections do not apply in extradition proceedings. That was the position of the Justice... You disagree with the federal opinion from the District Court in Alabama. Yes, but that opinion didn't bind the government. All right, but you'd think that it would provide some notice, hey, we better be careful if we broaden this treaty to lapse of time because we've got a federal opinion that says that that includes the speedy trial clause. Your Honor, well, first of all, when... It's hard for me to... First, we had scores of extradition treaties then on the books with the lapse of time language. And under that theory, the State Department would have had to go back and renegotiate all those treaties to clarify that lapse of time does not mean this Milonis decision. And that's not a practical response to a single adverse decision, nonbinding, issued by one judge. It may be different if the Supreme Court or the Court of Appeals issues a binding decision that says lapse of time equals a Sixth Amendment, but that's not what we had. When you've got broad words like lapse of time, even if the negotiators didn't think that it meant anything beyond the statute of limitations, if you've got sort of a term, don't things sometimes morph into that? I mean, I'm thinking like the Equal Protection Clause. When Brown v. Board of Education came down, I expect the drafters didn't think at that time... You know, the 14th Amendment didn't know about segregation or the Obergefell same-sex marriage. Certainly the negotiators didn't think when the amendment came down that equal protection included same-sex marriage, and yet the term applies. Two responses, Your Honor. First, we have the background candidate of construction, Factor v. Leubenheimer, where the Supreme Court said, if there are two reasonable constructions of the treaty, go with the one that favors extradition. No, it doesn't say that. It talks about equality. Then that is how four of... Reciprocity, right? That is how four of this Court's neighboring circuits, the Fourth, the Fifth, and the Eighth, have interpreted it. That's what we believe is the correct interpretation of Factor. That isn't what Factor actually says. Factor was about an extradition treaty, and if it was, as Mr. Cruz said, just interpret language broadly, then the fugitive in Factor should have won his case because there were two reasonable interpretations. The Court said one that favored the government. But that had to do with it. He was arguing that this limitation had to be, that law had to be the same in both countries, and in Factor, no, it didn't have to be the same. Well, and the Court said that there's two reasonable constructions in front of us, and they went with the government. But we don't have that situation here. Let me... Just to my second point on the history, is to interpret this broadly. We have 200 years of extradition proceedings on the books, and I think both Mr. Holley and I agree that the Sixth Amendment does not, by its own terms, apply to extradition proceedings. And the Sixth Amendment does not, by its own terms, regulate the conduct of Mexican courts and Mexican prosecutors. So the question here is, does this lapse of time phrase throw those clear bedrock background principles to the wind? And we think the answer is no. He's not applying it to the extradition. He's applying it by treaty to the prosecution. In Mexico, yes, Your Honor. And the background principle is that Sixth Amendment rights do not,  of a Mexican prosecutor and a Mexican judge. And so the question for Your Honors is, does the lapse of time phrase change that settled background principle? We think the answer is no. If the State Department, going back to 1877, up through the negotiation history here in 1978, and if the Senate wanted to take the dramatic step of bringing the Sixth Amendment to the table in extradition proceedings, our diplomats would have done so openly, conspicuously. But the prosecution is barred by the laws of either country. Relating to lapse of time. And Doggett tells us if this had been a U.S. If he had committed a crime in El Paso, then don't you think Doggett would have barred this prosecution? Likely, depending on the government's explanation for the delay. Right, then we'd have the Barker factors. Yes. My point here is that if our diplomats in the Senate wanted to take this dramatic step and start regulating the conduct of Mexican prosecutors, they wouldn't have done it through a benign phrase like lapse of time. Our entire extradition system is built on... You're giving them more credit than they deserve. I disagree, Your Honor. The entire system is built on notions of reciprocity, respect, and comity. To borrow a phrase from Justice Scalia, our diplomats, when they go out and negotiate these treaties, they're not trying to hide elephants. They're not trying to cede our extradition treaties with explosive new obstacles to extradition. Right, but reciprocity... In Mexico, I think the limitations period starts anew after the equivalent of an indictment, right? I think that is correct, Your Honor. Okay. And yet, so if under your theory, though, we wouldn't have that equality in the U.S. because it's only the statute of limitations, and it doesn't apply to after indictment, which is what is covered by the Speedy Trial Clause, we wouldn't have the equality between Mexico and the U.S. We have equality in that both countries' limitations periods are fully ingrained into the treaty. As to other... Mexico would give its citizens more rights than U.S. citizens would have that. Mexico gives its citizens the rights that it's granted under its limitations period. The U.S. has a separate limitations period with separate rules. Our citizens get that, and Mr. Cruz gets both. Now, the question is, does he get the additional protection of the Sixth Amendment? And we think the answer is no. It doesn't meet any traditional definition of a limitations period. It's not a fixed point. What about the four cases that the majority cites for the proposition that where you have an ambiguous treaty that implicates personal rights, such as the Speedy Trial right is a personal right, that that should be construed broadly? They cite Nielsen, Asakura, Jordan, and Jeffroy. I think that's how... Why don't those give us the kind of analogy that would suggest that we should apply these rights? Those treaties were about promoting rights of citizens of one country living in the other country. They had rights creating language. And so the purpose of the treaty was to create an agreement to give new rights or recognize treaty rights to our foreign citizens living in XYZ country. The purpose of the extradition treaty is not to grant individual rights to Mr. Cruz. The purpose of an extradition treaty is to formulate a system between the United States and Mexico for the purpose of exchanging individuals who have been charged with crimes in their respective country. And so in those cases, it makes perfect sense to read the treaty consistent with its purpose, granting individual rights to citizens. In this case, as in Factor, which was an extradition case, it makes sense to read it towards the purpose of creating the extradition relationship. And this is why four circuits are on record as reading Factor. We cited them in our briefs. It's saying when there is reasonable language, one or the other, don't choose the one that creates new obstacles to extradition. So there was a decision that was made that we're facilitating extradition, but we're going to give the defendant, wherever found, the benefit of the laws in both countries regarding time that would rule in his favor. So you get the benefit of the shorter statute of limitations, no matter where you commit the crime, and you get the benefit of the Mexican statute that pertains to prosecution after indictment, right? Yes. Okay. And then the corollary in the U.S. system is the speedy trial right? We agree that they protect complementary interests. We agree that the Sixth Amendment and the limitations appear to protect complementary interests. But the Sixth Amendment is not in and of itself a statute of limitations. And it doesn't meet the traditional definition. At least our reading of Factor is that if there's any dispute about that, go with the one that does not create new obstacles to extradition. And the final point, and this is the point that I started with, we think, and this is the judgment of not just the Department of Justice, but the State Department, and that those are views that this court traditionally affords deference to, is that putting the Barker factors into a 3184 proceeding, having magistrate judges decide whether or not foreign officials have been diligent or negligent, that is the type of inquiry that federal courts typically shun. These are the types of decisions that... Can courts just apply the time provision? So it doesn't matter what happened. If you're indicted and the law allows five years, five years have lapsed, you're immediately excused. The prosecution's immediately barred. It doesn't matter how diligent they were. It doesn't matter where you are. It doesn't matter whether you've asserted your right. Nothing matters. That's my understanding. Mexico has fairly long limitations periods because it protects the entire ballgame, and in this case, I think it's 40 years, but that also includes the time of punishment. What typically happens in a 3184 proceeding, as happened here, is that when Mexico presents the extradition request, it represented to us that we have brought this case and a judge, a Mexican judge, has made a determination that the Mexican statute of limitations lapses on X date, and extradition judges in this country usually defer to that finding unless the fugitive brings in something to question it. Would the Feedy Trial Act be equally applicable as a statute of limitations? I'm saying the act, not the clause, because you've argued that the clause involves the balancing of the Barker v. Wingo, whereas the act is more counting kinds of things. Yes, so the government's view is the Speedy Trial Act does not apply here. Mr. Cruz, under Mr. Cruz's construction, this is in his supplemental briefs, under his construction of lapse of time, he thinks it would apply under his theory of the case, and he says it may not do much work, but he has suggested that the Speedy Trial Act could apply, and his pleadings have also suggested, cited to state statutes, have cited to common law latches, and Judge Moore, we have this lapse of time phrase that's been on the books for almost 130 years, so we have a long arc of history to look at. And the government has not been able to find any reference in any treaty, ratification document, State Department document, correspondence from foreign governments or leading extradition treatises tying the lapse of time phrase to anything other than statute of limitations. And we also have 130 years of this country extraditing citizens, and outside of that one Milonis case, which the 11th Circuit twice discredited, we have not found any instance where an extradition judge, district court, or court of appeals has entertained... If it only means statute of limitations in any context, why would somebody get the benefit of the other part of the Mexican statute? I mean, why would it mean one thing for them and something else for us? Because I'm not an expert in common law versus civil law countries, but as I understand it, statute of limitations in common law countries operate differently than statute of limitations in civil law countries. That may reflect the differences in the way those proceedings are conducted. Ours are more adversarial, theirs are more inquisitive. And so it seems natural to me why they would define their limitations clock and their rules differently. The point is here, Mr. Cruz gets the benefit of both. And does he get the additional protection of trying to stop his Mexican prosecution by reference to this amendment? But if I understand you correctly, you're saying that if there were an American analog that operated the same way as the Mexican analog, he would not get the benefit of it because by definition, it's not a statute of limitations as we understand it.  If Congress radically re-altered the federal statute of limitations to adopt one closer to the one that Mexico uses, then yes, he would get the benefit. He gets the benefit of the applicable federal U.S. limitations period. And Congress can change how we've done it if we've, in the past, defined it from the period between the time of indictment to the time that the trial starts. But Congress could... Excuse me, the time of the offense to the time of the charging instrument. Congress could change that. Well, that's not what Article 7 of the treaty says. It doesn't say that the two countries have to have comparable laws. It says that the enforcement of the penalty for the offense for which extradition has been solved has become barred by lapse of time according to the laws of the requesting or requested party. It doesn't say that the two countries' laws have to be the same. What you're arguing is not what the treaty says. Then I may have misspoke. Mexico can craft its statute of limitations or its periods of prescription however it wants. The United States can do the same. And the treaty gives Mr. Cruz the benefit of both. What it doesn't give him are protections of anything outside of the statute of limitations. And given the interest at stake and the concerns that the State Department has about having courts just inquire into the motives and good faith or bad faith of foreign officials, this court should require a clear signal that the State Department and Congress intended to bring the Sixth Amendment into play, intended to subject foreign judges and prosecutors to metrics designed for U.S. criminal trials. And we think Mr. Cruz is showing here which strained reading of lapse of time but also disregards the historical markers that we laid out in our brief and the one discredited decision in Milonis. We think that that falls short. And so unless there are any more questions, we'd ask that the court affirm. We have asked you a lot of questions. Do we have time for maybe one more question? Anybody? Certainly not. Thank you, Judge Cole. Thank you, Mr. Lieberman. Thank you. Your Honor. Mr. Hawley, your opposing counsel seems to suggest that an American citizen in a comparable situation to Mr. Cruz wouldn't get the benefit of a speeded trial simply because there's no Bill of Rights in Mexico with the Sixth Amendment in it. What would you say about that? Well, Your Honor, I do believe that Article 7 has what the government is calling rights-creating language. They're saying the treaty has no rights-creating language. It does give U.S. citizens or whoever is in the United States rights. It gives them the right to assert whatever lapse of time defense exists in the United States. A more specific question that I thought Judge Clay was asking, and he can tell us if I'm misinterpreting this, he wants to know if it's true that an American citizen who commits a crime in Mexico would not get the benefit of the speeded trial clause in Mexico. Is that right? Under the U.S. Constitution. Yes, Your Honor, that is what the government is saying. And, of course, Mr. Cruz is now a U.S. citizen. He wasn't at the time, but he has become one. But, yes, if I take a vacation to Mexico and have a car accident and pay to settle it, and I'm charged, and I don't know it, and I come back home, and years and years can pass, you would think I would be clothed. Article 7 would give me the protections of the speeded trial clause. No, no, the question is, forget treaties. Pretend there's not a treaty anywhere. Does the U.S. Constitution protect an American citizen in Mexico when they commit a criminal offense? The government said no. The Sixth Amendment does not apply to an American citizen in Mexico in criminal cases. I believe that is true, Your Honor. The background presumption is that the constitutional rights do not apply to things overseas. Now, but by the same token, the statute of limitations don't apply either. And that is the work that Article 7 does. It gives those, it creates those rights. The backdrop assumption is they do not, statute of limitations don't apply, speedy trial clause doesn't apply. That's what Article 7 does. That's why they put it in there, because it is harsh to take those rights away from someone. Counsel, would you agree that if the, and I haven't looked at the Spanish language, if the Spanish language uses language that's the cognate of prescription, that that would be negative for your case? I don't think so, Your Honor. You don't think it does that? No, I don't think that would be negative at all. I mean, the government, and this is one reason why. I mean, I don't know how to testify, but prescription is sort of the civil law version of statute of limitation. I mean, it's not the same because it's in the civil law, but that's it, it performs largely the same function. I mean, if you're talking, if civil lawyers are talking to common law lawyers and they're talking about statute of limitation, the other ones will be talking about prescription. Isn't that right? Your Honor, the government doesn't explain the change in the language. I'm not talking about the change in the language. I'm talking about the current language now. He says the current language uses a word which is very close to the English word prescription, which is what civil law countries refer to in their version of statute of limitations. I think a ruling or logic based on a nuance in the Spanish language would have to be supported by expert testimony on what that means, not by our guesses about what a cognate is or what might be a false cognate. Do we know whether the Spanish language version changed at the time that the U.S. English version changed? I believe the government's answer to that was yes, and I think that might be so, but I can't remember the details. Mr. Hawley, was the treaty ratified by the U.S. Senate unanimously? I am not sure, Your Honor. I think it was. Would you expect the Senate to unanimously ratify it if it had a significant change in this respect? I don't see why not, Your Honor. There were other changes. When there's no indication in any of the Senate reports, the Senate is the ratifiers of the treaty. So we look at the text of the treaty as understood by the drafters and also as understood by the ratifiers, which are the U.S. senators. When there's no indication in the Senate reports that this was a change, isn't it rather stretched to say that this was a change? I don't think it was intended to be a change. I've never seen an analysis of the effect of ratification turned on the number of senators, Your Honor. You'd expect a debate, wouldn't you, if this was a significant change? Your Honor, it really is not that significant of a change, and this kind of goes to the government's floodgates argument. This issue only comes up rarely because it's only rare that someone has a meaningful claim. When I had this case, I could see this looks like a meaningful problem. This looks like a speedy trial clause violation, and that's why we raised it. It doesn't get raised that often because it just doesn't happen that often, and I don't think it was such a major change that the Senate had to be notified about it. What the Senate did know— The Senate didn't intend for it to be a change, but they are the ratifiers. They ratified it, and, you know, this is a question of did Mexico and the State Department, did they get permission from the Senate to extradite, expel a U.S. citizen despite the violation of the speedy trial clause? Did they get that authority? And they have to, and that's why in the Petit case they say this harsh construction must be clearly established by the language of the statute because it is a significant power that they're exercising. Do we have time for one more question? I have one question. I hate to be the last one. Can't it—isn't it necessarily true that if we accept your argument that if Mexico doesn't want to extradite somebody that we want them to extradite, and there's cases that are in the newspaper right now talking about it, and they don't want to, doesn't accepting your position give them all sorts of talking points for why they don't—they can just pull out and make some sort of colorable argument about Barker v. Wingo and say no and make it very difficult for our negotiators to say, oh, no, you're committed to extraditing this person? I don't see— You don't see anything like that ever happening? I don't see that as being such a hot topic is to open up such a maneuver. I mean, there have been much greater breaches between the countries than what would be assumed by that. Thank you, Mr. Howley. We certainly appreciate your—and thank you to you, Mr. Lieberman, as well. The case will be submitted—we'll take a break between this argument and the next. I can't tell you exactly how much time that will be, but you'll have time to stretch your legs and things of that sort, probably 15 or 20 minutes or so. Okay.